UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

FRANCISCO CHAVEZ,
    Plaintiff,

vs.                                                                                          08-1276

SYLVIA MAHONE, et. al.,
    Defendants.

## SUMMARY JUDGMENT ORDER

This cause is before the court for consideration of Defendant Dr. Sylvia Mahone's motion for summary judgment [d/e 80].

### I. BACKGROUND

The Plaintiff originally filed his complaint pursuant to 42 U.S.C. §1983 claiming that his constitutional rights were violated at the Pontiac Correctional Center. *See* November 21, 2008 Merit Review Order; September 25, 2009 Merit Review Order. On September 30, 2010, the court granted Defendant Illinois Department of Corrections Director Roger Walker's motion for summary judgment. The court also granted the Plaintiff's motion to dismiss Defendant Dr. Funk. *See* September 30, 2010 Summary Judgment Order. Therefore, the Plaintiff has the following surviving claim: Defendants Medical Director Sylvia Mahone and John Birkel violated his Eighth Amendment rights when they were deliberately indifferent to his serious medical condition.

Specifically, the Plaintiff says he suffered from an "infected keloid scar" on his ear from March 3, 2004 to May 7, 2007(Amd. Comp, p. 5) The Plaintiff says he was denied medical care until it became obvious that he had gangrene. The Plaintiff says the unnecessary delay in care caused permanent disfigurement and pain. The Plaintiff further states that his ear was injured during yard time in April of 2007, but Defendant Birkel refused to allow him medical care which further aggravated his condition.

### II. FACTS.

Dr. Sylvia Mahone says from July 24, 2006 to January 22, 2010 she was employed by Wexford Health Sources, Inc. as the Medical Director at Pontiac Correctional Center. (Def. Memo, Mahone Aff, p. 1). The Doctor says she took a leave of absence from this position in the late summer and fall of 2009. Dr. Mahone is currently the Medical Director at the Reception Center for the Illinois Department of Corrections in Joliet, Illinois. (Def. Memo, Mahone Aff, p. 1). As Medical Director, Dr. Mahone says she provides medical care and treatment to patients as well as supervises over physicians at her assigned prison.

STATEVILLE CORRECTIONAL CENTER

On October 3, 2001, the Plaintiff was examined by a physician at Stateville Correctional Center for evaluation of a keloid on his left ear. (Def. Memo, Mahone Aff, p. 2). The Plaintiff said the keloid had increased in size, but no other complaints are noted in the record. (Def. Memo, Mahone Aff, p. 2)

On December 19, 2001, the Plaintiff was seen by a Correctional Medical Technician when he stated that the keloid on his ear was bleeding. (Def. Memo, Mahone Aff, p. 2). The Plaintiff stated he had the keloid for two years. He was referred to a doctor for further examination and was seen by Dr. Ngu on the same day. The medical notes indicate the Plaintiff asked to have the keloid removed and stated that he had the keloid for three and a half years. The Plaintiff stated that he had tried to remove the keloid himself by tying a string around it. (Def. Memo, Mahone Aff, p. 13) Dr. Ngu applied an antibiotic to the area and instructed the Plaintiff not to try and remove the Keloid himself.

Dr. Ngu prepared a general surgery referral form. (Def. Memo, Mahone Aff, p. 3) However, on January 4, 2002, the medical record indicates that the Plaintiff did not show up for his appointment with the general surgery consultant and the Plaintiff signed his pass as "refused." (Def. Memo, Mahone Aff, p. 3, Ex. 4 Cons. Req.) The Plaintiff transferred to Pontiac Correctional Center in January of 2002.

PONTIAC CORRECTIONAL CENTER

The Plaintiff was seen in the health care unit at Pontiac Correctional Center on numerous occasions, but the following medical records pertain only to the Plaintiff's visits and treatment concerning the keloid on his ear:

MARCH 4, 2004: The Plaintiff was seen by Dr. Larson for complaints about the lump on his earlobe. The Plaintiff stated he had the condition since 1997 and there had been no recent changes. Dr. Larson reported that the Plaintiff had a 1.7 by 1.8 millimeter soft mass on the back of his left earlobe which was a soft tissue, keloid-like mass. Dr. Larson told the Plaintiff he should not squeeze or manipulate the keloid. Dr. Larson's assessment was it was best not to intervene and no treatment was planned at that time. (Def. Memo, Mahone Aff, p. 4)

AUGUST 29, 2004: The Plaintiff was again seen by Dr. Larson on an urgent care visit. The Plaintiff said he was experiencing pain in the keloid area of his ear. The Plaintiff says he had been playing basketball three weeks earlier when his ear was scratched, and it began hurting at that time. The Plaintiff stated that he had been using an antibiotic ointment. (Def. Memo, Mahone Aff, p. 4) Dr. Larson prescribed an oral antibiotic and a different ointment to be applied to the ear with dressing changes twice a day. The Plaintiff was also to return to sick call in a week. (Def. Memo, Mahone Aff, p. 4-5)

SEPTEMBER 5, 2004: The medical records show the Plaintiff was scheduled for a return visit, but he did not show up. (Def. Memo, Mahone Aff, p. 5). However, Dr. Larson did see the Plaintiff on the following day. The Plaintiff reported that the keloid had fallen off his ear. Dr. Larson observed that the left earlobe keloid had "auto amputated" on its own. (Def. Memo, Mahone Aff, p. 5). Dr. Larson drew a diagram of the ear which shows a "defect" to the left earlobe which appears to be a missing segment in the middle of the earlobe. (Def. Memo, Mahone Aff, p. 5) The doctor noted there was no signs of infection. He ordered the wound care to continue with medication and dressing changes. No new treatment was planned.

JANUARY 15, 2007: The Plaintiff sent a letter to Medical Director Mahone complaining that he had a keloid on his ear for several years.

JANUARY 16, 2007: Dr. Mahone responded with a memorandum stating she had reviewed the Plaintiff's medical records. The doctor says Plaintiff had made no complaints concerning his left ear since September 6, 2004. Nonetheless, Dr. Mahone told the Plaintiff that his ear would be evaluated that week. (Def. Memo, Mahone Aff, p. 6, Ex. 13)

JANUARY 18, 2007: Dr. Zhang evaluated the Plaintiff's ear. Dr. Zhang observed that the Plaintiff was in no acute distress, but his left earlobe had a 2 by 2 centimeter nodule. Dr. Zhang's noted that keloids are caused by trauma and this could be a reoccurrence. Dr. Zhang told the Plaintiff he could see a dermatologist after his sentence was served, but for now, the plan was to observe the nodule for any changes in size. (Def. Memo, Mahone Aff, p. 7)

MAY 7, 2007: The Plaintiff was seen by a registered nurse and reported that he had scratched his keloid and it had gotten bad. The nurse noted that the keloid was enlarged and had a foul smelling drainage. The nurse believed the Plaintiff had an engorged left earlobe keloid. The nurse contacted Dr. Mahone by telephone and reported her observations. Dr. Mahone prescribed an antibiotic and ordered that the ear be cleaned three times a day for ten days. Dr. Mahone also ordered a follow up visit in two weeks. (Def. Memo, Mahone Aff, p. 7)

MAY 8, 2007: The Plaintiff was seen by a nurse in urgent care and the nurse referred the Plaintiff to Dr. Mahone. (Def. Memo, Mahone Aff, p. 8) The Plaintiff said his ear was scratched by a fingernail while playing basketball two days prior. The Doctor observed a 1 ½ by 2 inch soft lesion that was fluid filled. Dr. Mahone's treatment plan called for an incision and drainage of the earlobe. The Plaintiff was also to receive a tetanus shot and the Doctor ordered a series of additional tests and a surgical referral was planned. (Def. Memo, Mahone Aff, p. 8)

Dr. Zhang performed the incision and drainage procedure later that same day. Dr. Zhang's assessment was the Plaintiff had gangrene of the left earlobe keloid. Ointment and a gauze covering was applied to the area. After the procedure, Dr. Zhang sent the Plaintiff's medical chart back to Dr. Mahone for a planned surgical removal of the dead keloid. (Def. Memo, Mahone Aff, p. 9).

3

On the same day, Dr. Mahone completed a request for consultation form asking that the Plaintiff be examined by an outside doctor for removal of the dead tissue from his earlobe. The Regional Medical Director approved the request. (Def. Memo, Mahone Aff, 9; Ex. 20 Req. Form)

MAY 9, 2007: The Plaintiff was sent to an outside hospital for surgical removal of the keloid. The surgery was performed and the Plaintiff returned to the prison on the same day. The doctor who performed the surgery, Dr. Scharf, recommended that the Plaintiff receive daily wound are and ibuprofen for pain. (Def. Memo, Mahone Aff, p. 10).

On the same day, the Plaintiff was examined by Dr. Zhang when he returned to the prison. The doctor noted that the Plaintiff did not state any complaints and there was no active bleeding from the wound. A treatment plan for dressing changes and pain relief was implemented with a follow up visit in a week.

MAY 10, 2007: Dr. Mahone requested a consultation with the University of Illinois at Chicago Medical Center Plastic Surgery Department and the request was approved. (Def. Memo, Mahone Aff, p. 10)

On May 19, 20 and 23, 2007, a nurse changed the Plaintiff's bandages and observed the wound. No signs of infection were noted. (Def. Memo, Mahone Aff, p. 11)

MAY 24, 2007: The Plaintiff was seen at the University of Illinois at Chicago Medical Center (herein UICMC) based on Dr. Mahone's referral. An outside doctor noted that it was too early for final reconstructive surgery. Therefore, care for the Plaintiff's wound was to continue with a follow up visit in two months for re-evaluation. (Def. Memo, Mahone Aff, p. 11)

The Plaintiff's bandages were changed throughout the month of May 2007 by medical staff and the Plaintiff was also seen again by Dr. Zhang on May 24, 2007. No infection was noted. (Def. Memo, Mahone Aff, p. 11)

JUNE 3, 2007: Dr. Zhang observed the wound. He saw no infection but the wound was healing slowly. The plan was to discontinue the dressing, but keep the ointment and antibiotic. The Plaintiff was directed to alert a medical technician if his symptoms became worse. (Def. Memo, Mahone Aff, p. 12)

JUNE 5, 2007: Dr. Zhang saw the Plaintiff in sick call. The doctor observed an area of the earlobe in which tissue had lost its blood supply. The doctor made a note to inform Dr. Mahone of her observation.

JUNE 28, 2007: The Plaintiff was again evaluated at the UICMC. Reconstructive surgery was planned in two stages. (Def. Memo, Mahone Aff, p. 12).

4

JULY 14, 2007: Dr. Mahone saw the Plaintiff. The Plaintiff reported some pain in his left earlobe. He said he had been keeping it clean and dry and applying antibiotic ointment. The doctor noted that the left ear was missing a portion of the lower lobe at the bottom of his ear. The doctor noted that the Plaintiff's earlobe had "death of tissue with self debridement or removal." (Def. Memo, Mahone Aff., p. 13). Dr. Mahone prescribed an antibiotic and directed the Plaintiff to continue the daily cleaning of his ear.

SEPTEMBER 13, 2007: Dr. Mahone and Dr. Funk reviewed the Plaintiff's latest visit with the UICMC and Dr. Funk approved the follow up visit with Dr. Ramasastry. (Def. Memo, Mahone Aff., p. 13).

SEPTEMBER 18, 2007: The Plaintiff had his follow up appointment with Dr. Ramasastry and the doctor reviewed the two stage surgery plan. On September 27, 2007, the Medical Center requested Dr. Ramasastry to review and develop a plan of care which the medical record shows was completed by the doctor on December 6, 2007. (Def. Memo, Mahone Aff., p. 14, Ex. 38). The doctor requested a preoperative appointment in December and the first stage of surgery to be scheduled in January. (Def. Memo, Mahone Aff., p. 14)

DECEMBER 18, 2007: The Plaintiff was seen at the UICMC and was scheduled for surgery on January 7, 2008. (Def. Memo, Mahone Aff., p. 15)

DECEMBER 20, 2007: The Plaintiff was seen by Dr. Zhang for a follow up visit. No infection or any other problems were noted. (Def. Memo, Mahone Aff., p. 15).

JANUARY 7, 2007: Dr. Ramasastry performed the first stage of the surgery on the Plaintiff's left ear. When the Plaintiff returned, he was seen by a nurse in urgent care. She noted that the dressing on the Plaintiff's ear was saturated with blood and called Dr. Mahone. The nurse reported that the Plaintiff was not in pain. Dr. Mahone told the nurse to change the dressing and ordered an antibiotic for five days. The Plaintiff reported back to the health care unit for a follow up visit the next day. (Def. Memo, Mahone Aff., p. 16)

JANUARY 10, 2007: The Plaintiff was seen by Dr. Ramasastry for a follow up appointment. The doctor noted that the ear looked good and there was no sign of infection. (Def. Memo, Mahone Aff., p. 16-17)

JANUARY 15, 2007: Dr. Zhang saw the Plaintiff and removed his sutures. On January 17, 2007, Dr. Mahone and Dr. Funk discussed the Plaintiff's condition and his second surgery was approved. (Def. Memo, Mahone Aff., p. 17).

FEBRUARY 5, 2008: Dr. Ramasastry saw the Plaintiff for a follow up visit and noted that the Plaintiff's ear was healing well and there was no infection. A preoperative visit was scheduled as well as the second phase of the Plaintiff's surgery, pending approval. (Def. Memo, Mahone Aff.,

p. 17-18). On February 7, 2008, Dr. Mahone spoke with Dr. Funk and the next stage of the Plaintiff's treatment was approved. (Def. Memo, Mahone Aff., p. 18)

FEBRUARY 8, 2008: Dr. Mahone examined the Plaintiff and he reported no problems. The Plaintiff did ask about his follow up care and the doctor told him it had been approved. (Def. Memo, Mahone Aff., p. 18)

FEBRUARY 25, 2008: Dr. Ramasastry examined the Plaintiff and his second stage ear reconstruction surgery was performed. (Def. Memo, Mahone Aff., p. 19). The Plaintiff was seen by a nurse on his return. His dressing was dry and the Plaintiff had no complaints of pain. The Plaintiff was given a Tylenol and antibiotic and placed on the urgent call list for dressing changes per Dr. Mahone's orders. (Def. Memo, Mahone Aff., p. 19). The Plaintiff received dressing changes on February 26 and 27, 2008, and no problems were noted. (Def. Memo, Mahone Aff., p. 19-20).

APRIL 2, 2008: The Plaintiff was seen by a doctor at the facility with complaints of pain and discharge from his left earlobe. He was given pain medication and his ear was treated. (Def. Memo, Mahone Aff., p. 20)

APRIL 10, 2008: Dr. Mahone examined the Plaintiff. The Plaintiff said he had an infection that began two or three weeks prior. The doctor noted mild tenderness and a small amount of drainage. Dr. Mahone states that he believed the Plaintiff's ear had become reinfected after surgery. The Plaintiff was given Motrin, was told to keep the ear clean and was given ointment and antibiotics for ten days. Dr. Mahone also noted in the records to consult with Dr. Funk on the Plaintiff's condition. (Def. Memo, Mahone Aff., p. 20). The doctors discussed the Plaintiff's condition on April 22, 2008, and he was approved for evaluation at the University of Illinois at Chicago Medical Center. (Def. Memo, Mahone Aff., p. 20)

APRIL 29, 2008: Dr. Ramasastry examined the Plaintiff and noted increased drainage and pain in the Plaintiff's ear. No new treatment plan was recommended. (Def. Memo, Mahone Aff., p. 21)
When he returned to the correctional center, a nurse checked on the Plaintiff's dressing and told him not to remove the dressing.

On May 6 to May 26, 2008, the medical records show the Plaintiff was seen for daily dressing changes. The area was cleaned and antibiotic cream was applied. On May 20, 2008, Dr. Mahone again referred the Plaintiff to the UICMC for "a recurrent infection at the graft site of his left ear, foul order and darkened areas of the skin." (Def. Memo, Mahone Aff., p. 21-22)

MAY 27, 2008: Dr. Mahone examined the Plaintiff and ordered dressing changes with hydrogen peroxide and antibiotic ointment for two weeks. On May 29, 2008, Dr. Funk approved another evaluation at the UICMC. (Def. Memo, Mahone Aff., p.

22)

On June 1 and 9, 2008, a nurse changed the Plaintiff's bandage. The Plaintiff had no complaints of pain.(Def. Memo, Mahone Aff., p. 22)

JUNE 17, 2008: Dr. Ramasastry examined the Plaintiff and finds no infection. However, the doctor did recommend further surgery. Dr. Mahone approved the recommendation. (Def. Memo, Mahone Aff., p. 23).

JUNE 30, 2008: Dr. Mahone met with the Plaintiff and discussed Dr. Ramasastry's recommendations. That same day the surgery was approved by Dr. Funk. (Def. Memo, Mahone Aff., p. 24).

JULY 3, 2008: The Plaintiff was seen by a nurse and complained that his ear was draining. The nurse's plan was to continue the current treatment. (Def. Memo, Mahone Aff., p. 24)

JULY 30, 2008: The Plaintiff was examined by a doctor at the facility. The doctor noted that the Plaintiff did not appear to be in distress, but a keloid had formed following his surgery. The doctor asked Dr. Mahone to review whether the Plaintiff needed further review from the UICMC. (Def. Memo, Mahone Aff., p. 24-25).

AUGUST 21, 2008: The Plaintiff was seen by a different doctor at UICMC, Dr. Dolezal, in preparation for the additional surgery recommended by Dr. Ramasastry. (Def. Memo, Mahone Aff., p. 25)

AUGUST 27, 2008: The Plaintiff was seen by a doctor in the healthcare unit to discuss the recommendations of the UICMC doctors. (Def. Memo, Mahone Aff., p. 25)

SEPTEMBER 11, 2008: Dr. Dolezal operated on the Plaintiff's ear as planned. (Def. Memo, Mahone Aff., p. 25)

SEPTEMBER 25, 2008: Dr. Dolezal saw the Plaintiff for a follow up visit. The doctor noted that the Plaintiff was doing well. (Def. Memo, Mahone Aff., p. 26)

SEPTEMBER 28, 2009: Dr. Mahone examined the Plaintiff. No complaints by the Plaintiff were noted. Dr. Mahone noted that the UICMC doctors took out the Plaintiff's sutures during the last visit, but did not provide the Plaintiff with a steroid injection in his ear as planned. Nonetheless, Dr. Mahone noted that the ear looked good. The doctor noted the Plaintiff had a keloid scar on his neck. Dr. Mahone approved the next follow up visit at UICMC. (Def. Memo, Mahone Aff., p. 26)

The Plaintiff filed his lawsuit on October 14, 2008.

NOVEMBER 20, 2008: Dr. Dolezal re-evaluated the Plaintiff and gave him a steroid shot to the left ear as planned. (Def. Memo, Mahone Aff., p. 27)

MAY 22, 2009: Dr. Mahone saw the Plaintiff for complaints regarding the Plaintiff's blood pressure and the Plaintiff noted that he might have a scrotal mass. During the examination, the Plaintiff stated that he wanted an injection in the scar on his neck and the keloid removed. The Plaintiff had a one inch by two and a half inch keloid on his neck. His left ear looked good and was normal in appearance. The doctor noted that the keloid had formed after the surgery was performed over a year ago. Dr. Mahone noted that the Plaintiff had an old, healed keloid on his neck. Other treatment was prescribed for the Plaintiff's blood pressure and scrotal mass. (Def. Memo, Mahone Aff., p. 27-28)

JULY 10, 2009: The Plaintiff complained that his keloid was itching and he had been scratching it. Dr. Mahone noted that the keloid appeared infected and it was his assessment that the Plaintiff "had been manipulating his left keloid and lower left earlobe." (Def. Memo, Mahone Aff., p. 28) Dr. Mahone prescribed hydrocortisone cream and antibiotic ointment and planned a collegial review for further referral. (Def. Memo, Mahone Aff., p. 28) No further treatment was provided by Dr. Mahone. (Def. Memo, Mahone Aff., p. 29).

Dr. Funk is the Regional Medical Director for Wexford Health Sources, Inc. (Def. Memo, Dr. Funk Aff., p. 1). Dr. Funk confirms the same description of the Plaintiff's medical records as Dr. Mahone and the doctors have provided copies of those records. (Def. Memo, Dr. Funk Aff, p. 1-29, Ex. 1-93) He says Dr. Mahone repeatedly referred the Plaintiff to outside specialists and he approved each referral. (Def. Memo, Funk Aff., p. 29)

III. LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2000). "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . .

grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

IV. ANALYSIS

Defendant Mahone contends that the Plaintiff cannot demonstrate that she was deliberately indifferent to his serious medical condition. To establish a violation of the Eighth Amendment, the Plaintiff must pass a two prong test. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). The first prong of the test requires the Plaintiff to demonstrate that the alleged deprivation was sufficiently serious. *Farmer v Brennan,* 511 U.S. 825, 834 (1994). The Seventh Circuit has acknowledge that a "serious medical need" is far from "self-defining." *Gutierrez v Peters,* 11 F3d 1364, 1370 (7th Cir. 1997). However, the court noted that the Supreme Court clearly intended to include not only conditions that are life-threatening, but also those in which denial or delay in medical care results in needless pain and suffering. *Id.*

The second prong of the Eighth Amendment test requires the Plaintiff to show that the defendants acted with deliberate indifference. *Farmer,* 511 U.S. at 828. "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42) Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987). In addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997).

Before addressing the dispositive motion, the court notes that the Plaintiff clearly cannot substantiate some of the claims in his amended complaint. For instance, the Plaintiff alleged that he suffered from an "infected keloid scar" on his ear from March 3, 2004 to May 7, 2007.(Amd. Comp, p. 5). There is no evidence in the medical record to support this contention. The Plaintiff reported one potential problem in August and September of 2004. However, on both occasions the Plaintiff was seen and treated by Dr. Larson. There is no evidence of deliberate indifference toward his medical condition and no indication Dr. Mahone was directly or indirectly involved in the Plaintiff's care or the treatment decisions on these occasions.

The court notes that over the next three years, from September of 2004 to January of 2007, another keloid grew on the Plaintiff's ear. The Plaintiff has presented no evidence that he requested medical care concerning the keloid or that Dr. Mahone refused his treatment during this time. When the Plaintiff did send a letter concerning the keloid in January of 2007, Dr. Mahone immediately scheduled a doctor's appointment, but the treating physician did not recommend any further treatment.

Therefore, the crux of the Plaintiff's case comes down to the treatment he received in May of 2007 and after. In response to the summary judgment motion, the Plaintiff focuses on two specific events. First, the Plaintiff says Dr. Mahone was deliberately indifferent to his medical condition in May of 2007. Second, the Plaintiff claims Dr. Mahone failed to follow the prescribed treatment after surgery.

The Plaintiff claims on May 7, 2007, he went to the health care unit with an enlarged ear which had a foul smelling discharge. The Plaintiff says when the nurse reported his condition to Dr. Mahone, the doctor did not provide immediate care to the Plaintiff. Instead, the Plaintiff says he had to return to the medical unit the next day when his condition worsened. The record shows Dr. Mahone did provide care when she prescribed an antibiotic and ordered that medical staff to clean the Plaintiff's ear three times a day for the next ten days. The Plaintiff was scheduled for a follow up appointment in a little over a week, but he was not denied treatment. Instead, when the Plaintiff reported that he felt worse the next day, he immediately received care. Dr. Mahone ordered Dr. Zhang to make an incision and drain the Plaintiff's ear. Dr. Zhang then noted that he detected gangrene during the procedure. The Plaintiff received treatment and was taken to an outside hospital for follow up treatment the next day.

There is also no evidence that the Plaintiff missed any follow up appointments with outside medical providers. The only evidence the Plaintiff has presented is two "Surgical/ Procedural Discharge Instructions." (Plain. Resp, p. 76, 78). The first one requests a follow up visit on January 10, 2008, which the Plaintiff received. (Plain. Resp, p. 76). The second one requests a follow up visit on February 28, 2008, but the Plaintiff instead saw the doctor for follow up three days earlier on February 25, 2008.

The Plaintiff also claims he was denied a prescribed gel after surgery, but there is no evidence to support this claim in the medical record from the prison or outside medical providers. Instead, the medical record shows the Plaintiff was seen repeatedly after surgery by both health care unit doctors and specialists. His wound was repeatedly checked for signs of infection, ointment was applied and he was kept on antibiotics.

While the Defendant has provided a lengthy overview of the medical record in this case, the court is disappointed with gaps in the record before it. For instance, the doctor does not explain what a keloid is, what are the typical types of treatment, whether a keloid can be successfully treated and whether keloids often reoccur. *See Revels v. Meyers*, 2009 WL 3122514 at 2 (C.D.Cal., Sept. 25, 2009)*(*record demonstrates keloid is excessively thick scar, has a high rate of reocurrence after surgery and is "difficult, and sometimes impossible, to treat effectively."); *see also Brock v. Wright*, 315 F.3d 158, 161 (2d Cir.2003)(record demonstrates keloids are abnormal growths of tissue that can continue to grow for years and may cause disfigurement).

Nonetheless, Defendant Mahone says throughout the Plaintiff's incarceration, his keloid

10

was progressively treated, first with observation, then with antibiotics and evaluation, next with treatment from an outside physician and finally by specialists at the University of Illinois Medical Center at Chicago. Dr. Mahone claims she provided the treatment she believed was appropriate based on the information that was available to her each time she saw the Plaintiff. She repeatedly referred the Plaintiff to specialists and followed the recommendations of those specialists.

Medical decisions, such as whether one course of treatment is preferable to another, are beyond the Eighth Amendment's purview. The Eighth Amendment is not a vehicle for bringing claims of medical malpractice. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir.1996). It should also be kept in mind that inappropriate medical treatment based on pure negligence, or even a series of purely negligent acts is not the same as indifference to a serious medical need. *Sellers v. Henman*, 41 F.3d 1100, 1102-03 (7th Cir.1994). For a medical professional to be liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents " 'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.' " *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir.2008) *quoting Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir.1998); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir.2006). The Plaintiff has not demonstrated that Dr. Mahone was deliberately indifferent to his keloid. Therefore, the motion for summary judgment is granted.

**IT IS THEREFORE ORDERED that:**

**1) Defendant Mahone's motion for summary judgment is granted pursuant to Fed. R. Civ. P. 56. [d/e 80]. The Clerk of the Court is directed to dismiss Defendant Mahone. The parties are to bear their own costs.**

**2) The Plaintiff has one surviving claim: Defendant CMT John Birkel violated his Eighth Amendment rights when he was deliberately indifferent to the Plaintiff's serious medical condition. If Defendant Birkel wishes to file a motion for summary judgment he must file his motion within 21 days of this order.**

**3) A final pretrial conference is scheduled for May 5, 2011 at 11:30 a.m. by video conference. The clerk is to issue a writ for the parties participation in the video conference.**

**4) The defendants' attorney(s) is reminded that she bears the responsibility for preparing the final pretrial order pursuant to Local Rule 16.3-4(H). *See Appendix 2* to Local Rules for a sample form. [www.ilcd.uscourts.gov/local rules.](www.ilcd.uscourts.gov/local rules.) The proposed order must include (1) the name, prison number, and place of incarceration for each inmate to be called as a witness; 2) the name and place of employment for each Illinois Department of Corrections employee to be called as a**

**witness; and 3) the names and addresses of any witnesses who are not inmates or IDOC employees for whom a party seeks a trial subpoena. The party seeking the subpoena must provide the witness fee and mileage fee to such witness and is responsible for service of the subpoena under Fed. R. Civ. P. 45.**

Enter this 28th day of February, 2011.

                                      **s/Michael M. Mihm**
                                  _____
                                        MICHAEL M. MIHM
                               UNITED STATES DISTRICT JUDGE